1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ERIN GEE,

4                    Plaintiff,

5            v.                              17 CV 4689 (ALC) (SN)

6    CBS BROADCASTING INC., et al.,

7                    Defendants.

8    ------------------------------x
                                          New York, N.Y.
9                                         January 12, 2018
                                          3:15 p.m.
10
     Before:
11
                          HON. SARAH NETBURN,
12
                                          Magistrate Judge
13
                            APPEARANCES
14
     KEVIN TODD MINTZER
15        Attorney for Plaintiff

16
     MORGAN, LEWIS & BOCKIUS LLP
17        Attorneys for Defendants
     BY:  CHELSEA LYNN CONANAN
18

19

20

21

22

23

24

25

1                    (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your

3     appearance for the record.

4              MR. MINTZER:  Kevin Mintzer for Plaintiff Erin Gee,

5     your Honor.  Good afternoon.

6              MS. CONANAN:  Chelsea Conanan for Defendant CBS, your

7     Honor.  Good afternoon.

8              THE COURT:  Good afternoon.

9              Thank you.  We are here on the plaintiff's January 2

10    letter, and I have the defendants' January 9 response.  The

11    response suggests that a few of the items on the January 2

12    letter may have been resolved, and because I'm a perpetual

13    optimist, maybe some other issues have been resolved since the

14    January 9 letter.

15             Why don't I give Mr. Mintz an opportunity to tell me

16    where things stand at this point and to focus our attention so

17    we can be as productive as possible today.

18             MR. MINTZER:  Your Honor, as I read the January

19    letter, I think that they've basically agreed to provide what

20    we're asking for with respect to all of our requests but one.

21             So I think, as far as I can tell, that's the only

22    request that's still on the table, which is related to document

23    request number 37 pertaining to other complaints of

24    discrimination.

25             Before getting to that, I think it would be useful,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

1   since we did go through the exercise of having presented this

2   to the Court, to get the Court's order requiring defendants to

3   comply with what they said they would do in their letter, but I

4   don't read their letter as holding anything back beyond what

5   we've asked for in the request.  So I don't know that we need a

6   more in-detail discussion about them.

7          THE COURT:  I'll ask Ms. Conanan about when I can

8   expect to get those documents produced.  Why don't I hear your

9   position with respect to request 37 which is for formal or

10  informal complaints or charges of gender discrimination or

11  retaliation.  I assume it's retaliation for raising gender

12  discrimination issues.

13         MR. MINTZER:  Yes, your Honor.

14         THE COURT:  Made by any employee in CBS News, and the

15  period is January 1, 2012, to the present.

16         MR. MINTZER:  Your Honor, the Second Circuit has long

17  recognized that other complaints of discrimination, other

18  incidents of discrimination, alleged incidents of

19  discrimination, are relevant even in a single-person disparate

20  treatment case to show the defendants' intent and potentially a

21  pattern of behavior.  That dates back, as we cite, even going

22  back to the Holland case in 1990.

23         Now, courts since then have focused on three sort of

24  limiting principles that apply to the idea of discovery of

25  those other types of discrimination complaints, and we've tried

IC4YCFEG

1    to be very cognizant of those principles in formulating our

2    request.

3         The first is that generally speaking, I think the

4    cases hold that you get the type of other evidence, other

5    complaints of discrimination that pertain to the type of

6    discrimination that the plaintiff has made, along with

7    obviously in a retaliation case, retaliation claims that go

8    with it so that in this gender discrimination and retaliation

9    case, as your Honor was alluding to already, we've only asked

10   for that, gender discrimination and retaliation claims.

11        We haven't asked for age discrimination claims and

12   other types of discrimination claims.  So that's one part of

13   the prong that I think is clear from the case law, and

14   plaintiff's request complies with that.

15        The next part relates to the appropriate timeframe of

16   the request.  What we've asked for is a period of five years,

17   which I think, your Honor, is very consistent with the cases

18   that we've cited.

19        There are some cases that provide discovery for

20   periods longer than that, but we've asked for five years.  I

21   don't believe there are any cases cited by defendant in which

22   they've suggested that five years is too long.  There are a

23   couple of cases which I'll talk about which deny discovery

24   altogether under the circumstances of those cases, but --

25        THE COURT:  Can I just interrupt you so I can be

1    reminded of some of the relevant facts.  Can you remind me when

2    she started working at CBS News and when you contend, either

3    the first incident of discrimination or the one that's sort of

4    the thrust of the case when she was removed.

5           MR. MINTZER:  So Ms. Gee is a long-time employee of

6    CBS News dating back -- I think it's in the complaint -- to the

7    mid 90's, mid to late 90's.  She's been there for approximately

8    17 years.

9           The nature of the claims here started when she was

10   passed over for the opportunity to be a substitute director on

11   the CBS Evening News which was the program that she had worked

12   on for a good, long time, many of the years that she had been

13   there.

14          And she was informed of that in late 2014 and then

15   made a complaint about it in early 2015, or I think perhaps she

16   was actually informed about it in early 2015 and then

17   immediately made the complaint within a couple days later.

18          A few weeks after that, she was removed from the

19   broadcast altogether and basically put in no job at all for

20   several months.  She literally came to work and did nothing.

21          I don't know if your Honor is familiar with the

22   concept of the rubber room that they have for teachers

23   sometimes when they're on disciplinary charges and not allowed

24   in the classroom.  That was the equivalent of what Ms. Gee had

25   for several months.

1         Then after that they finally put her on the CBS

2  Evening News for the weekend edition which was two days of work

3  a week with three days sitting in the rubber room with little

4  blips here and there, and that was pretty much how it went for

5  her for the remainder of her time at CBS which lasted until

6  late 2017.  I think it was October 2017 that she resigned to

7  take another position, a full-time position at another network.

8  So that's the background of the timing.

9         So what we've asked for is a period that's basically

10  dating back a couple of years prior to when she alleges she was

11  discriminated and retaliated against and then a couple years

12  into the future for a total of five years, which, as I say, is

13  consistent with the papers, and I haven't seen anything in

14  their papers that take issue with that timeframe.

15         Now, the third prong of the test that the courts have

16  developed for this issue is where we probably have the biggest

17  conflict, and that is the question of whether or not discovery

18  is appropriate on an organizational-wide basis or something

19  less than that.

20         Trying to be conservative about it, the request that

21  we served was not for CBS in general and CBS Broadcasting,

22  which is not the largest corporate entity of CBS, but the

23  broadcasting side would be a larger organization.

24         We haven't asked for that.  We've asked just for CBS

25  News, which is a smaller entity.  I think they may be formally

1    different companies, but basically CBS News is sort of a

2    division of CBS Broadcasting.

3          THE COURT:  Do you have a sense of whether we're

4    talking about 2,000 employees or 20,000 employees?

5          MR. MINTZER:  So I was looking, your Honor, at the

6    publicly filed documents with the SEC which have CBS

7    Corporation, which is the big organization, everything, 15,000

8    employees.  What your Honor has to understand is that CBS News

9    is a tiny part of that.

10          Now, to answer your question, I don't know how tiny.

11   Perhaps my colleague knows.  My estimate would have been that

12   the total employee population of CBS News is maybe between

13   1,000 and 2,000 because CBS Corporation, which has 15,000,

14   according to their publicly filed information -- that includes

15   radio, broadcasting, studios.  They make television shows.

16   They have publishing.  They have a lot of entities.  CBS News

17   is a relatively small part of that larger empire.

18          So I think that that estimate is fair, but it's just

19   an estimate on my part.  I don't have the actual information.

20   But if we take that rough estimate, we're looking at

21   potentially, let's say if there are a couple thousand employees

22   at CBS News, presumably if we assume a 50/50 gender ratio,

23   that's maybe 1,000 women.

24          So the question is is it appropriate to get discovery

25   over a five-year period over that population to see what has

1   been going on there, and it is appropriate in this case,

2   your Honor, for several reasons.

3        The cases, I think, recognize that some cases do allow

4   for discovery in a large organization, but I think it's fair to

5   say all of the cases that allow this discovery at all recognize

6   that it's appropriate, at least for the division or the

7   department at issue.

8        My colleague would like to try to slice this finely

9   and say that the relevant department is the program that

10  Ms. Gee has worked on.  I think she's throwing in also the

11  morning telecast that she worked on at the very beginning of

12  her career at CBS.  But that's not a realistic pool to

13  determine what, if any, culture of allowing discrimination is

14  going on at this network.

15       The population you're talking about for those two

16  programs -- again, I don't have the hard data, but I would

17  estimate that we're talking about maybe 100 or 200 people -- is

18  not anywhere close to that, and they're not even conceding that

19  even discovery of that would be appropriate.  They want to

20  limit it further to people who have Ms. Gee's title as an

21  assistant director.  There is no case that suggests that that's

22  appropriate.

23       Now, there are cases, including the Rifkinson v. CBS

24  case that they cite, that in the context of trying to get

25  comparative data about employees generally say that you're

1   limited to what is similarly situated, but that's not what

2   we're looking at here.

3          Our request related to similarly situated employees

4   which one of the ones that was resolved, for example, was

5   limited to people in her title and with roughly her job duties

6   and reporting to the same people.  But the cases don't suggest

7   that in the context of other complaints of discrimination that

8   a plaintiff is so limited.

9          In fact, Rifkinson -- I did look at the case's

10  subsequent history, including ruling on pretrial motions, and

11  if the Court is inclined to look, there is a pretrial in limine

12  order that came after the decision that defendants rely on in

13  which the court allows plaintiff to introduce evidence of

14  discrimination related to Connie Chung, who, if your Honor may

15  recall, was an anchor at CBS News, and the plaintiff in

16  Rifkinson was just a mid-level manager, basically not talent at

17  all.

18          So that case in no way meant to suggest that the

19  relevant universe of employees that are appropriate to look at

20  for other patterns of discrimination is limited to similarly

21  situated.  It does not hold that, and the subsequent history of

22  it shows.

23          The reason why the Court should allow us to have

24  discovery of other complaints of discrimination beyond simply

25  Ms. Gee's supervisors is because plaintiff has the right to

1   look to see if these senior-level executives that were involved

2   in the decision here -- and they are -- Steve Capus, who is one

3   of the decision-makers, is basically I think the number two

4   person at CBS News.  Frank Governale is another senior-level

5   executive.

6          These are not low-level people who only have influence

7   over their particular domain.  These are people who have broad

8   influence in the network, as well as the HR department, who,

9   after plaintiff complained about this, looked into it and

10  basically approved of what CBS did.

11         All of those folks were involved, and they would be

12  involved presumably if there were other complaints of

13  discrimination throughout the news division, those same people.

14  So we should be permitted to get discovery of that.

15         Now, the last thing I would say on their proposal

16  cutting it so finely -- and I don't think I fully realized it

17  until I saw their letter -- the way they seem to present this

18  to your Honor is that there is also a per se rule that should

19  be applied that we're not allowed to introduce evidence beyond

20  the individual's supervisor.  In other words, if there were not

21  individual complaints against the particular supervisors at

22  issue here, they're not relevant.

23         The Court should consider the Supreme Court's decision

24  in 2008 of Sprint v. Mendelsohn I think is the hyphenated name

25  of the case, your Honor.  I can get you a citation.

1          That case dealt with the potential admissibility of

2     other complaint evidence, which sometimes is called me-too

3     evidence which predated all of the current discussion.

4          That case specifically said that there should not be a

5     per se rule about other complaint evidence for admissibility to

6     say that it's only limited to similarly situated employees.

7     For admissibility, the Supreme Court said that it had to be

8     looked at on a case-by-case basis considering all the factors.

9          So there certainly wouldn't be a basis for discovery

10    purposes, which is obviously a broader pool that we should be

11    looking at, to limit us in that way.  So we think that the

12    request that we have made, 37, is appropriately framed.  It's

13    consistent with the cases.

14          We think there is more than a good-faith basis,

15    particularly given what's in the public domain now about what's

16    happening at CBS News and the complaints of discrimination that

17    have apparently been made or ignored in other situations.

18    There is more than a good-faith basis for us to pursue this

19    evidence and for the Court to order it.

20          THE COURT:  Thank you.

21          Ms. Conanan.

22          MS. CONANAN:  Sure.  Your Honor, I wanted to address

23    the first issue that you raised.  We're in agreement with

24    plaintiff's counsel that all of the issues set forth in his

25    letter to the Court have been resolved except for request

1    number 37, which deals with prior complaints.

2         THE COURT:  When will you get your responses to the

3    plaintiff?

4         MS. CONANAN:  I think we'll be able to do that by

5    Wednesday of next week, your Honor.  Monday is a holiday.  So

6    some people are out of the office.

7         THE COURT:  Wednesday is fine.

8         MS. CONANAN:  Your Honor, we're not suggesting that

9    there is any type of per se rule on the admissibility of this

10   evidence.  We're not even at the trial stage yet.  So I'm not

11   sure why that's relevant.  I want to bring it back to the scope

12   of this case and the particular claims the plaintiff is making

13   in her complaint.

14        This is not a case that is -- although it's trying to

15   be framed that way, it's not a case about the culture of CBS'

16   alleged discrimination.  It's not a case about the sexual

17   harassment allegations that have come to light recently with

18   the Me-Too movement and Charlie Rose and Matt Lauer and all of

19   the high-profile individuals who have been painted in the news

20   recently.

21        This case is limited to a particular timeframe which

22   plaintiff's counsel explained centered around Ms. Gee's alleged

23   denial of a promotion in January 2015 and the months that

24   followed.

25        It's about particular actors, who her supervisors

1   were, who her supervisors were on the particular broadcast that

2   she worked.  It's about the particular business unit within the

3   CBS News organization that dealt with her complaints.

4          THE COURT:  Mr. Mintz made reference to some

5   senior-level people who were involved in her decision.

6          Are these people in the more narrow division that

7   you're just referencing?  Or are those people CBS News people?

8          MS. CONANAN:  I think they're CBS News people,

9   your Honor.  But in terms of what's alleged in the complaint

10  and what has been borne out in discovery so far, plaintiff

11  alleges that TJ Asprea, who was the producer of CBS Evening

12  News, Frank Governale, who had an operations function for that

13  broadcast, and Robert Klug, who was her manager at some point

14  when she worked on CBS News -- that those three individuals

15  were the ones that effectively removed her from the broadcast

16  and assigned her to CBS morning news.  So there is a particular

17  sphere of facts that we're dealing with that relate to

18  plaintiff's specific claims.

19         She has not alleged systemic discrimination.  She has

20  not alleged class claims.  She has not alleged, as I mentioned

21  before, a broader culture of CBS' alleged discrimination or

22  retaliation.  That is not what's at issue here.

23         Your Honor, I will submit that we don't necessarily

24  think that this information is particularly relevant, although

25  plaintiff has made the argument that he's entitled to it under

1   Second Circuit case law.  The issue here is proportionate.

2          With the recent retooling of the Federal Rules of

3   Civil Procedure, there is even more of a focus on tailoring

4   discovery requests to the specific claims and needs and

5   allegations of the case with a particular focus on the cost and

6   burden of undergoing expansive discovery.  So the request

7   that's written to us is extremely broad.

8          THE COURT:  If you're going to raise sort of cost and

9   burden concerns, have you looked into that?  Can you answer the

10  question about how many employees there are in CBS News?

11         MS. CONANAN:  I don't have an exact number,

12  your Honor, but I believe it's upwards of 3,000.  To explain

13  also just the structure --

14         THE COURT:  Can I just ask you one other question.  Is

15  there a dedicated HR office or person for the news division as

16  compared to CBS corporate?

17         MS. CONANAN:  I'm not really sure, your Honor.  I

18  believe that the way their HR program works is that there are

19  particular HR personnel who are dedicated to particular

20  broadcasts.  So it's not as if they cover everything for CBS

21  News.  There's a particular broadcast that they support as an

22  HR professional.

23         So, in order for us to delve into getting various

24  documents and information regarding prior complaints dating

25  back to 2012, we have to touch base with all of those HR

1    personnel that cover those particular broadcasts.  So it's a

2    much larger endeavor for us to do that.

3           THE COURT:  Put aside email, which I would assume is

4    where most of this "informal complaint" is going to be located.

5    Let's focus for a minute on formal complaints.

6           How does your client organize its complaints?  So, if

7    somebody files a formal complaint in whatever format is

8    appropriate in the organization, where does it go?  Where does

9    it sit?  Is it logged?  Is there a database?  How is it

10   maintained?

11          MS. CONANAN:  As far as I know, your Honor, there is

12   no centralized database for all of these complaints across the

13   different broadcasts.  It also depends upon where the complaint

14   originates.

15          So, for instance, if there is a gender discrimination

16   complaint, it might be funneled to the labor employment wing of

17   CBS News, and they would handle it.  But that doesn't

18   necessarily mean that other parts, for instance, of CBS

19   litigation -- they also handle separate complaints.  So there

20   are various components that come into play.

21          As I said, I'm not sure on the specifics, but I don't

22   believe there is centralized database that holds all of the

23   complaints across all of the CBS News broadcasts.

24          What I can say though is that we have the ability --

25   this is something we suggested to plaintiff's counsel -- to run

1   a report across the various different business units to

2   determine what kinds of gender discrimination complaints have

3   been made, formal complaints that is, whether it's in

4   litigation or at the EEOC stage or some other administrative

5   stage.

6        We can narrow that universe that way and provide

7   plaintiff with a substantive list as a starting point and then

8   work with him from there to figure out what documents he's

9   looking for.

10       THE COURT:  I think I heard you say that you have a

11  database, which I'm curious to hear about, but that also it's

12  for people who have taken the step of either filing a lawsuit

13  or filing a charge.

14       MS. CONANAN:  Yes, your Honor.

15       THE COURT:  Presumably that's a minority of people,

16  and there will be a body of people who lodged a complaint with

17  the company but maybe didn't go ahead and pursue sort of

18  outside litigation.

19       So they made a formal complaint with the company that

20  didn't result in litigation or an EEOC charge, maybe because it

21  was unfounded, maybe because the company resolved the issue, or

22  maybe because the complaining employee elected not to pursue it

23  any further.

24       MS. CONANAN:  Yes, your Honor.

25       THE COURT:  Where is that information stored?

1          MS. CONANAN:  Formal complaints.  So my understanding

2     is that there is a way to obtain that information through the

3     various legal units that handle them.  So, for instance, we can

4     run a report by CBS' labor and employment division, if they

5     have handled that particular complaint.  So, if it's

6     discrimination, if it's retaliation, if it's harassment, CBS

7     labor employment counsel would handle that, and they have

8     access to that information.

9          THE COURT:  And that's in-house labor and employment

10    counsel for CBS Corporation?

11         MS. CONANAN:  Yes.  CBS Corporation, your Honor.  I

12    believe so.

13         On the other side, we would also have to check with

14    CBS litigation because they also are a separate business unit,

15    separate legal wing of the company, and they are also funneling

16    complaints and dealing with them.  So we can also do the same

17    type of generating a report that has substantive information on

18    it about the nature of the complaint, the claims, the

19    disposition, and work from there.

20         Now, to get back to your Honor's point about informal

21    complaints, first, that brings up another issue with

22    plaintiff's request.  We don't really have a sense of what that

23    means, whether it's in an email, whether it's something that's

24    made in passing and then jotted down in someone's notebook.  I

25    really don't have a sense of what those documents would entail.

1          Without us potentially identifying custodians or doing

2     a broader email search, assuming that those complaints are

3     contained within the email, I'm not really sure if we can

4     respond to plaintiff's request the way it's written.  If we

5     limit the request to formal complaints that have made their way

6     to litigation or EEOC --

7          THE COURT:  The people who proceed to litigation and

8     to an EEOC charge is the very top of the pyramid.  So, in my

9     view, that is not an appropriate cap.  So the thing I'm trying

10    to figure out is I'm an employee of CBS News.  I think my boss

11    is sexually harassing me.  Who do I go to.

12         I presumably don't go to labor and employment.  I

13    presumably don't go to litigation.  I assume there is an HR

14    person.  Who do I speak to and say, hey, Mike is acting

15    inappropriately.  Who is that person?  That to me is the sort

16    of first touch if there are allegations of sex discrimination

17    in the workplace.

18         MS. CONANAN:  Right.  So there are several formal HR

19    channels.  There is a hotline.

20         THE COURT:  Are those recorded?

21         MS. CONANAN:  I believe they are, your Honor.  As I

22    mentioned before, I believe the way CBS structures its HR

23    department is that individual HR personnel are responsible for

24    certain specific business units tied to the particular

25    broadcast.

1          So I don't have the knowledge with me today,

2     your Honor, unfortunately, as to whether that all floats up

3     into one particular organization and where that organization

4     sits within CBS News, but my understanding is that individual

5     HR personnel handle complaints that are brought within each

6     particular broadcast.

7          THE COURT:  I think there is a lot of information that

8     we need to explore here to figure out sort of how the system

9     works.  I don't have a terribly clear view at this point, other

10    than people who have taken the step of pursuing charges with an

11    outside entity, whether it's courts or the EEOC.  It seems to

12    me that there is still a fairly substantial lack of information

13    about, for instance, this hotline.

14         Again, it's not clear to me.  You say that HR is

15    divided by business groups.  I don't know if CBS News is a

16    business group, or you mentioned programming.  So I don't know

17    whether or not the weekend show reports to Joe and the morning

18    news show reports to Sally.  It's not clear to me how you're

19    slicing the HR responsibilities.

20         MS. CONANAN:  My understanding -- I, again, recognize

21    that there is more investigation on my end to do, your Honor,

22    and I apologize for not being fully prepared for this -- is

23    that CBS News is the broadcasting organization under which

24    there are about a dozen separate broadcasts.  So plaintiff

25    worked on CBS Evening News and CBS morning news.  Then there

1   are about ten separate broadcasts and shows that have a

2   different producer, different director, different staff.

3          THE COURT:  All part of CBS News though.

4          MS. CONANAN:  All feeding up to CBS News.  So there

5   are particular HR personnel that are assigned to particular

6   broadcasts.  That's my understanding of how the organization

7   works at this point in terms of HR.

8          THE COURT:  That's surprising to me.  It doesn't mean

9   that's not the way it works, but it seems odd to me that you

10  would divide it by programming.  If I'm in hair and makeup, I

11  might be on multiple shows.  It's surprising to me that you

12  would be grouped by the show.  That doesn't mean that's not the

13  way it works.

14         Has your client told you anything that maybe gives you

15  some insight?

16         MR. MINTZER:  Not my client, your Honor.  I'm sort of

17  constrained as to what I can say about this, but this is not

18  the first time I'm dealing with CBS News.  So I have a little

19  bit of an understanding.  I can't say it's completely current.

20         My experience with dealing with CBS News is that the

21  labor and employment counsel and this fellow by the name of

22  Mark Engstrom who I've dealt with -- I think maybe he was

23  recently promoted.  He was sort of, on the legal side at least,

24  the top of the food chain for all of CBS News labor and

25  employment issues so that any kind of discrimination complaint

1    that got to the level of someone like me was involved, he was

2    dealing with it, at least before it went to outside counsel,

3    which suggests to me that there is some structure within CBS

4    News that it's not so as decentralized as counsel is

5    suggesting.

6            I want to be clear.  I'm not suggesting that anyone is

7    saying anything intentionally erroneous, but I think that there

8    is a more -- it may well be that on HR level there is a point

9    person for each show, each broadcast, but that doesn't mean

10   that they don't report up to a centralized HR that covers CBS

11   News.

12           CBS News has its own president, your Honor.  It has

13   its own administrative structure under it.  The idea that there

14   is no way to isolate what's within HR within CBS News is not

15   within my experience and sort of farfetched.

16           The one thing I would like to add, your Honor, to

17   hopefully be constructive is in terms of the question of

18   informal complaints, we would accept any complaint that went

19   through either to HR in one of the methods that counsel is

20   describing or they have a diversity office also -- I don't know

21   if it's always been called that -- which is another avenue that

22   I think people can express complaints.

23           We are not looking, for purposes of this request, for

24   them to scour their emails to see whether anyone over the last

25   five years has said the word "discrimination" in any context.

22

1   If there was any confusion about that, I'm happy to clarify

2   that.

3          By informal complaints, we're trying to draw the

4   distinction precisely what your Honor was suggesting, which is

5   we're not limiting it to things that were formal litigation or

6   a charge.  But on the other hand, I think it's fair to limit it

7   to things that have at least gone to some sort of central HR

8   function or some sort of diversity office or have been

9   communicated in some more regimented way and not just a random

10  email that happened to be sent at some point.

11         So I think, if that helps in getting them to clarify

12  what they have in their systems and what's more readily

13  accessible, I'm happy to put that on the table.

14         THE COURT:  I'm going to order the production.  I'm

15  going to use the word "formal" to include sort of

16  employee-registered complaints that were conducted through the

17  appropriate avenues that the organization has created.  So it

18  would not include the watercooler talk.  It would not include

19  the errant email or the sort of rumors and speculation or sort

20  of employee-to-employee complaints.

21         What I would include is any complaint that an employee

22  made regarding his or her employment at the news division that

23  that employee lodged through the avenues that are made

24  available, and whether that's through HR or labor and

25  employment or diversity or some other structure, that's what

1    needs to be produced.

2         MS. CONANAN:  Your Honor, can I ask one clarifying

3    question.

4         THE COURT:  Yes.

5         MS. CONANAN:  You said any complaint by any employee.

6    Is that limited to gender discrimination?  Retaliation?

7         THE COURT:  It's certainly limited to gender

8    discrimination.  Maybe it should just be limited to women

9    complaining about discrimination because they are women.

10        I don't know enough about whether or not it makes

11   sense or whether we think we're going to see gender

12   discrimination going against men, but it's going to be gender

13   discrimination and any retaliation for making a gender

14   discrimination complaint.  So it certainly wouldn't cover race

15   discrimination, age discrimination, sexual orientation

16   discrimination.

17        MS. CONANAN:  Thank you, your Honor.

18        MR. MINTZER:  Your Honor, just to clarify, I think we

19   all understand that sexual harassment is a component of gender

20   discrimination.  So, if someone is saying that their boss is

21   treating them inappropriately and it's manifesting itself in

22   sexual comments and things like that, that's part of what I

23   assume is going to be produced under this order.

24        THE COURT:  That seems appropriate to me.

25   Discrimination on the basis of sex, which includes sexual

24

1   harassment, a sexual, hostile workplace, etc.

2          MS. CONANAN:  Your Honor, one more clarifying

3   question.

4          THE COURT:  Sure.

5          MS. CONANAN:  I don't know if you've already made up

6   your mind, your Honor.  We had suggested limiting it further to

7   Ms. Gee's position as associate director.

8          THE COURT:  I don't think that's appropriate.  Given

9   what I understand the defense is going to be, I think it's fair

10  for the plaintiff to be able to explore whether or not there

11  was a culture that permitted discrimination on the basis for an

12  employment decision, and I don't think it's appropriate to

13  limit it to assistant or associate directors.

14         MS. CONANAN:  Thank you, your Honor.

15         THE COURT:  I understand that the parties have

16  resolved everything else, but I just want to make sure we are

17  moving in the right direction.

18         So where are we on ESI generally?

19         MR. MINTZER:  Well, your Honor, we had submitted a

20  copy of a status letter.

21         THE COURT:  I have that here too.

22         MR. MINTZER:  I think that what's in the status letter

23  is all correct.  Your specific question about ESI -- I have not

24  received anything yet.  The last thing that happened is that

25  there had been -- there have been a few disputes, your Honor,

1    that I had written to you to ask you for extra pages at some

2    point to put in a longer letter.  Then we had some further

3    discussions about that.

4            THE COURT:  Yes.  I recall addressing that while on

5    vacation.

6            MR. MINTZER:  I apologize, your Honor.

7            I had given them a set of proposed search terms for --

8    there was a universe of requests that my understanding of what

9    they were proposing was limiting everything to searches that

10   had Ms. Gee's name in it, and that was not something that I

11   could accept because there were several requests that would be

12   looking for relevant information that wouldn't necessarily

13   mention her, like information about comparators or things like

14   why a comparator was chosen for a job.

15           So I thought we had a hurdle where they were just

16   refusing to do anything beyond my client's name or things with

17   my client's name.  I think we've gotten past that.  Once I

18   understood that they were prepared to essentially look beyond

19   just her name, I gave them some specific search terms, and that

20   was on New Year's Day that I conveyed that proposal.

21           By the way, just to be clear, your Honor, that's after

22   weeks of sort of this back and forth wrangling.

23           THE COURT:  Here is my concern.  The plaintiff's

24   deposition is going to be in late January.  You've noticed six

25   witness depositions in February, but presumably you're going to

1    want these documents before those depositions.

2           MR. MINTZER:  Yes, your Honor, including my client's

3    deposition.  She shouldn't have to sit for a deposition without

4    me knowing what the universe, at least -- I'm not saying that

5    every single piece of paper has to be produced, your Honor.

6           THE COURT:  What's the deadline for fact discovery

7    right now?

8           MR. MINTZER:  I think it's March 16.

9           MS. CONANAN:  Your Honor, if I can just clarify a

10   couple things.

11          THE COURT:  Sure.

12          MS. CONANAN:  We originally sent plaintiff's counsel a

13   search term ESI proposal on November 20 with a list of very

14   specific search terms.  We limited it to plaintiff's name but

15   also included other search terms because it is a huge universe

16   of custodians.

17          There are 11 custodians that we accepted.  We accepted

18   his timeframe of January 1, 2014.  We said to plaintiff's

19   counsel, if you have an alternative proposal, please provide it

20   to us, and we have had several meet-and-confer discussions.

21   We've had emails back and forth.  We're in the process of

22   running hit reports for the search terms he gave us on

23   January 1 after we repeatedly asked for them.

24          So we are running those hit reports trying to figure

25   out if it's a reasonable amount of documents to review.  The

1    last hit report we got turned up around 8,000 documents that we

2    told plaintiff's counsel about.

3          Now we are engaging an outside vendor in order to

4    further refine the hit reports and see if we can limit the

5    universe even further based on his proposal.  So we have been

6    working very diligently.

7          THE COURT:  Should I ask for a status letter in a

8    week?

9          MS. CONANAN:  Sure.

10          MR. MINTZER:  Yes, your Honor.  Your Honor doesn't

11    care about the back-and-forth.  So I'm not going to even engage

12    in it further.  My concern is I want to meet the Court's

13    deadlines.  I'm not at all optimistic, based on what I have to

14    date, that I'm going to be in a position to do that.

15          THE COURT:  It sounds like everybody is working

16    diligently now.  Let's do the following:  I'll take a status

17    letter on the 19th.  It can be a one-sentence joint letter that

18    says, we got it.  We're all set.

19          If at that point there are still disputes about search

20    terms, I'll take three-page letters from each side, and I'll

21    hear you out.  It may be that I want to either call you back

22    into court or I'll call you on the phone and we'll talk it

23    through, but I'd like to resolve this issue.

24          If I'm going to get the letter, it's going to be the

25    19th of January.  We're starting to get pushed up against

1    deadlines.

2             MR. MINTZER:  That's the concern, your Honor.  Just to

3    emphasize also -- I want to be clear -- I'm not suggesting that

4    these lawyers are doing anything to delay this.  I think that

5    they're very hard working.  I think that their client is not

6    sufficiently understanding the urgency of the proceedings and

7    the realness of the deadlines here.  So that's why I raised

8    this.

9             THE COURT:  Well, we have a deadline now.  So

10   hopefully by Wednesday you're going to get the production that

11   you've agreed to produce, and by the 19th I'm hoping I get a

12   one-sentence letter saying that the ESI protocol is set.

13            MR. MINTZER:  I hope so too, your Honor.

14            THE COURT:  Anything further?

15            MR. MINTZER:  That's it.

16            THE COURT:  Can we go off the record for one second.

17            (Pause)

18            THE COURT:  Anything further from either side?

19            MR. MINTZER:  No, your Honor.  Thank you very much.

20            MS. CONANAN:  No, your Honor.  Thank you.

21            THE COURT:  I'll hear from you next Friday.

22            (Adjourned)

23

24

25